**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**ECF CASE**

---------------------------------------------------------------------X

**AMY CHIN,**

**Plaintiff,**

**06 CV 1437(RJH)(GWG)**

**COMPLAINT**

**-against-**

**Jury Trial Demanded**

**NEW YORK CITY HOUSING AUTHORITY,**

**Defendant.**

---------------------------------------------------------------------X

Plaintiff, **AMY CHIN**, by her attorneys, the **LAW OFFICES OF LEE NUWESRA**, complaining of Defendant, the **NEW YORK CITY HOUSING AUTHORITY**, respectfully alleges as follow:

## NATURE OF THE ACTION

1. This action is for discrimination and retaliation based on Race, and/or Ethnicity/National Origin in the terms, conditions, and privileges of employment protected under § 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (1982) ("Section 1981"). Plaintiff also brings supplementary State and City discrimination and retaliation claims based on Race and/or National Origin in the terms, conditions, and privileges of employment, as protected under the New York State Human Rights Law, Executive Law §§ 290 et seq. (the "Human Rights Law"), as well as the New York City Human Rights Law, Administrative Code §§ 8-101 et seq. (the "Code").

2. Plaintiff also seeks costs and attorneys fees authorized by § 1981, the Code, and other relevant Statutes.

## JURISDICTION AND VENUE

3. The jurisdiction of the Court over this controversy as to enforcement of the provisions of 42 U.S.C. § 1981 is based upon 28 U.S.C. § 1331.

4. Supplemental jurisdiction of the Court over the State Claims brought under the Human Rights Law, and the Code is based on 28 U.S.C. § 1367(a).

5. The unlawful employment practices alleged below were committed within this District. Accordingly, venue lies within the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. §1391(b).

## PARTIES

6. Amy Chin, the Plaintiff herein ("Plaintiff" or "Chin"), resides in East Brunswick, State of New Jersey.

7. Upon information and belief, Defendant New York Housing Authority (hereinafter "NYCHA") is a non-Mayoral City Agency and is a political subdivision of the State of New York, with its principal business offices located in the County of New York, State of New York.

## FACTS

8. Plaintiff is a Chinese woman, born in the country of China. As such she is a member of a protected class under the Federal, State and City laws.

9. Defendant violated Federal, State and City laws when it continuously failed to promote her on account of her Race, Ethnicity/National Origin, and/or in Retaliation for engaging in protected activity. Defendant did this by continuously promoting several other non-Chinese employees, who were not as qualified as Plaintiff.

10. On December 21, 1981, Plaintiff was hired for the position of Assistant Accountant, by Defendant, New York City Housing Authority from a civil service list.

11. In 1982, after her probationary period, Plaintiff was promoted to a Civil Service Accountant position.

12. In 1989, Plaintiff was promoted to the position of Associate Accountant.

13. During her tenure, Plaintiff's time, attendance and work performance were and continue to be exemplary.

14. In 1991, Plaintiff observed that many non-Chinese outside applicants were appointed by Defendant Authority to M-1 level positions. Because of this, Plaintiff complained to Defendant's Office of Equal Opportunity ("OEO").

15. In 1993, due in part, to Ms. Chin's expertise and qualifications, she was promoted to an M-1 position.

16. One of Ms. Chin's first directives required that she develop an entirely new method for the reconciliation of reports. She also created the system reports which are still significant today, as they were converted to the new system named Oracle.

17. The following are the qualification requirements for the position of Administrative Accountant according to Defendant:

1) A baccalaureate degree from an accredited college including or supplemented by 24 credits in accounting, including one course each in advanced accounting, auditing, and cost accounting and four years of satisfactory full-time professional accounting or auditing experience, at least 18 months of which must have been in an administrative, managerial or executive capacity or supervising a staff performing accounting or auditing work; or

2) A valid New York State Certified Public Accountant license and at least 18 months of satisfactory full-time

> professional accounting or auditing experience in an administrative, managerial or executive capacity or supervising a staff performing accounting or auditing work.

18. Ms. Chin more than satisfies the above mentioned requirements. She has been an Accountant since 1981, almost 25 years. She holds a Bachelor's of Science Degree in Accounting from Brooklyn College. Moreover, she has almost 13 years of successful and extensive experience in management within the accounting field.

19. Plaintiff's responsibilities and duties as an Administrative Accountant include: analyzing and searching the Financial Management Systems, "FMS". She has also been able to avoid and control the errors and problems that occur. The methods she utilized include her own invented processes. For example, Plaintiff created the Open Batch Report, Missing Order Number Report, Invoices Open More Than Two Days Report, Effective Date Error Report, CN Report by Locations, Insufficient (R&I) Report by Locations and by Borough, Summary Report by Borough and User By ID Report.

20. She is so detail oriented and effective that when there were desk audits, Plaintiff was consulted. Moreover, Plaintiff received a raise as a result of one audit, because of her excellent performance in managing the system.

21. In early December 2003, Plaintiff verbally asked Mr. Ahmad Thabet, Deputy Director of Financial Operations (Egyptian) for a promotion to Assistant Director (M-2), in the Control Section Disbursement Division. Later that month, around Christmas, Mr. Thabet rejected her request for promotion. Mr. Thabet's reason for his rejection was because he needed to wait for the new Controller to be appointed, replacing Mr. Michael Pagani, who had retired.

22. At the end of December 2003, Plaintiff was advised by Mr. Pagani, that he recommended her for the position, prior to his retirement.

23. About 3 months later, on March 2, 2004, Plaintiff made a written request to Mr. Ahmad Thabet, Deputy Director of Financial Operations (Egyptian), for an upgrade to the position of Assistant Director (M-2), in the Control Section Disbursement Division.

24. In this request, Plaintiff outlined some of her contributions and achievements as Manager of Control since May 1993. The contributions and achievements included, but were not limited to:

1) Assistance in the design of the control system in Disbursement;
2) Implementation of the pilot program of reconciling Accounts Payable to General Ledger;
3) Implementation of the pilot program for the Accounts Payable-Imaging System;
4) The accomplishment of critical analysis and resolution of many systems and accounting problems;
5) The recommendation and implementation of all vendors with a tax IDs to reduce duplicate vendors;
6) The recommendation of valuable solutions for minimizing costs;
7) Major Contribution to the research of IRS and State tax codes and rules;
8) Direction of the staff in processing urgent requests timely during the system conversion to Oracle, while all other upper management were involved in another location, and amongst others;
9) The leadership of the special project in cutting down the Accounts Payable-Holds.

25. On that same day, March 2, 2004, Mr. Thabet denied Plaintiff's request on the grounds that there was no money for her promotion and that that position was eliminated.

26. However, in April 2004, Mr. Bernard Pigott was "temporarily" placed in Plaintiff's Department, and assigned to the disbursement division.

27. In June 2004, Mr. Pigott was placed in the M-2 position, the same position Plaintiff had requested, and was rejected for.

28. Mr. Pigott, is a White Italian male, who was not as qualified as Ms. Chin for the M-2 position. In addition, he did not have a college degree or (Accounts Payable) experience.

29. Plaintiff questioned Mr. Thabet about this troubling development, and was told that this was just a temporary arrangement until the new Controller was hired.

30. On October 5, 2004, Plaintiff complained to Mr. Thabet again about these troubling facts, which she felt to be discriminatory. He threatened her by telling her that she better not complain, it is a bad time to complain, that she has an M-1 managerial title and could be fired since managers don't have a Union. He also said, "Italians and Jews have power and connections." Plaintiff continued to protest her discriminatory treatment.

31. On October 14, 2004, Mr. Thabet told Plaintiff that she is no longer in charge of the Control Group, and was reassigned to the Petty Cash Unit only.

32. Plaintiff was shocked because the Petty Cash Unit, is an entry level position, Plaintiff immediately complained about this retaliatory conduct.

33. On October 25, 2004, Plaintiff wrote to the new Controller, Mr. Pagelson outlining her contributions and background, explaining how the department has grown, her staff doubled, as well as her duties and responsibilities. She pointed out that with these developments and the reorganization of the departments, her title has remained the same, and once again requested an upgrade in the Analysis and Control Section.

34. On December 6, 2004, Plaintiff wrote to Mr. Pagelson, thanking him and Mr. Aaron Mittelman (White/Jewish), Deputy Director, for their compliments of her in regards to her achievements and success in implementation and continued management of the Financial Analysis and Internal Control Unit in Disbursement (Accounts Payable).

The purpose of this letter was also to respond to the offer from Mr. Pagelson and Mr. Mittelman for a transfer without any upgrading.

35. Plaintiff expressed how her achievements and contributions have been well addressed; however, they have not been rewarded. Although she respected their recommendation for a transfer, she strongly believed that she should be given an opportunity for a promotion/upgrade in the area she has been assigned to for over 12 years. It is the area she is most familiar with and would be most effective in.

36. On the same day, Mr. Pagelson responded to Plaintiff's letter by thanking her for her suggestions and that the new position (transfer) in the Treasury Division would provide the clearest path for advancement.

37. After Plaintiff's several complaints, Mr. Thabet, continued his retaliation against her by demeaning her, undermining her authority, and taking away many of her supervisory responsibilities.

38. Other examples of his retaliatory conduct were: limiting Plaintiff's responsibilities and treating her as a Bookkeeper; limiting Plaintiff's access to important computer systems that she previously had access to; giving more training to her staff than her; communicating to her staff in the department without sending her a copy of the same communication or involving her in the process.

39. Mr. Thabet did not allow her to review her Senior staff's work, but held her responsible for their errors.

40. Mr. Thabet also retaliated against her by sending her out on jobs that are in essence, menial in nature.

41. The duties Plaintiff has been assigned to, in retaliation for her engagement in protected activity, are tantamount to a demotion.

42. For example, in the morning of August 3, 2005, Mr. Thabet informed Plaintiff that she was assigned to a "special project", and to report to the Capital Project-Administration to assist. Plaintiff went there and was told to come back at 2:00 p.m. Between 2:00-4:00 p.m., Plaintiff was told to wait for a report. At about 4:00 p.m., Plaintiff still did not receive said report. She was then told to return the next day for the report. She was effectively utilized as a messenger.

43. This demeaning and humiliating task could have been done by fax, mail, email, or by messenger, and did not require Plaintiff, who is a Manager of Financial Analysis and Internal Control, to personally pick it up.

44. On Monday, August 8, 2005, Plaintiff reported the details of her special project, which occurred on August 3 and 4 of 2005, to Mr. Jeffrey A. Pagelson, the new Controller.

45. Another example of the retaliation and degrading treatment was when Plaintiff was removed from handling important Freedom of Information Law, "FOIL" requests, and reassigned to retrieve reports.

46. On August 30, 2005, Plaintiff complained to Mr. Pagelson again and outlined in detail, the retaliatory adverse treatment she was receiving by Mr. Thabet.

47. As further retaliation, on November 10, 2005, Ms. Phyllis Call, Administrative Assistant to the Controller, emailed Plaintiff, informing her of her permanent transfer date of November 28, 2005.

48. The current transfer has caused Plaintiff tremendous hardship. She has to commute two extra hours, and caused her to neglect her elderly father.

49. On November 23, 2005, Plaintiff wrote Mr. Pagelson, requesting that he reconsider this transfer based on the meeting they had on November 9, 2005.

50. On the evening of November 25, 2005, Ms. Chin received a letter from Dale Kutzbach, Director of Human Resources, dated November 23, 2005, informing her that there has been a reorganization of the Accounting and Fiscal Services Department.

51. In the same letter, Plaintiff was also informed that effective November 28, 2005, she will be reassigned to the Manhattan Management Department, located at 1980 Lexington Avenue, New York, N.Y., and that she is directed to report to Yvonne Rosado, Office Manager.

52. On December 5, 2005, Plaintiff complained to Mr. Tino Hernandez, the Chairman of NYCHA and Dale Kutzbach, Director of Human Resources, stating that her transfer is discriminatory and clearly retaliatory. She stated that she has been with the Housing Authority since 1981, and has been doing an excellent job as Administrative Accountant for almost 13 years.

53. Plaintiff also stated that she has been passed over for promotion to M-2 too many times. She also inquired about her unjustified transfer, and sought clarification regarding her seniority with the department. Less senior Managers, namely, Mr. Pigott (White/Italian) and Mr. Calandruccio (White/Italian), were not forced to transfer.

54. From 2002-2004, the following employees of Defendant have been promoted to M-2: 1) Salwa Hanna (Egyptian), 2) Moataz Edabie (Egyptian), 3) Salu (Skaria) Jacob (Egyptian), 4) Gisela Fornell (White/Spanish), 5) Kristie L. Maduro (White), 6) Jean

Mondesir (White), 7) Margaret Farrell (White), 8) Louis Yeostros (White), 9) Linda McKay (White), 10) Hind Zaid (Egyptian), 11) Bernard Pigott (White/Italian), and 12) Philip Carlucci (White/Italian).

55. Upon information and belief, most of the above mentioned employees who were promoted, do not have degrees and/or degrees in accounting. Moreover, none of them are Chinese. Furthermore, none of these promotions were posted, as required by NYCHA policies and/or procedures.

56. Plaintiff did not volunteer for transfer. Rather, she vehemently objected to it, and was unjustifiably transferred to Harlem.

57. In her new position and location, Plaintiff's duties are those of a bookkeeper/clerk. Her day consists of reviewing invoices and inquiring whether they were paid.

58. Plaintiff's Agency complaints have been fruitless and she is suffering from stress, depression, and her obligations to her professional development and family have been adversely affected.

59. Upon information and belief, non-Chinese employees were not treated the same.

60. Plaintiff’s transfer by Defendant, and Defendant's failure to promote Plaintiff, was on account of her Race, Ethnicity/National Origin, and/or in Retaliation for engaging in protected activity, in violation of Federal, State and City laws.

**DAMAGES**

61. As a direct and proximate consequence of Defendant’s intentional and unlawful discriminatory employment policies and practices, and retaliation as heretofore and hereafter described, Plaintiff has suffered mental and emotional harm, and other non-pecuniary losses, including, but not limited to, depression, anxiety, loss of self-esteem,

and injury to her professional standing, and had to incur expenses including legal fees and costs.

**AS FOR A FIRST CAUSE OF ACTION: 42 U.S.C. § 1981**
**(Race, Ethnicity/National Origin Discrimination and/or Retaliation by Defendant NYCHA)**

62. Plaintiff repeats and re-avers each and every one of the allegations set forth in paragraphs 1 through 61 of this complaint with the same force and effect as if each was fully set forth herein.

63. Plaintiff is a Chinese woman, born in the country of China. As such she is a member of a protected class under 42 U.S.C. § 1981.

64. Defendant violated 42 U.S.C. § 1981, when it continuously failed to promote her on account of her Race, Ethnicity/National Origin, and/or in Retaliation for engaging in protected activity. Defendant did this by continuously promoting several other non-Chinese employees, who were not as qualified as Plaintiff.

65. On December 21, 1981, Plaintiff was hired for the position of Assistant Accountant, by Defendant, New York City Housing Authority from a civil service list.

66. In 1982, after her probationary period, Plaintiff was promoted to a Civil Service Accountant position.

67. In 1989, Plaintiff was promoted to the position of Associate Accountant.

68. During her tenure, Plaintiff's time, attendance and work performance were and continue to be exemplary.

69. In 1991, Plaintiff observed that many non-Chinese outside applicants were appointed by Defendant Authority to M-1 level positions. Because of this, Plaintiff complained to Defendant's Office of Equal Opportunity ("OEO").

70. In 1993, due in part, to Ms. Chin's expertise and qualifications, she was promoted to an M-1 position.

71. One of Ms. Chin's first directives required that she develop an entirely new method for the reconciliation of reports. She also created the system reports which are still significant today, as they were converted to the new system named Oracle.

72. The following are the qualification requirements for the position of Administrative Accountant according to Defendant:

1) A baccalaureate degree from an accredited college including or supplemented by 24 credits in accounting, including one course each in advanced accounting, auditing, and cost accounting and four years of satisfactory full-time professional accounting or auditing experience, at least 18 months of which must have been in an administrative, managerial or executive capacity or supervising a staff performing accounting or auditing work; or

2) A valid New York State Certified Public Accountant license and at least 18 months of satisfactory full-time professional accounting or auditing experience in an administrative, managerial or executive capacity or supervising a staff performing accounting or auditing work.

73. Ms. Chin more than satisfies the above mentioned requirements. She has been an Accountant since 1981, almost 25 years. She holds a Bachelor's of Science Degree in Accounting from Brooklyn College. Moreover, she has almost 13 years of successful and extensive experience in management within the accounting field.

74. Plaintiff's responsibilities and duties as an Administrative Accountant include: analyzing and searching the Financial Management Systems, "FMS". She has also been able to avoid and control the errors and problems that occur. The methods she utilized include her own invented processes. For example, Plaintiff created the Open Batch

Report, Missing Order Number Report, Invoices Open More Than Two Days Report, Effective Date Error Report, CN Report by Locations, Insufficient (R&I) Report by Locations and by Borough, Summary Report by Borough and User By ID Report.

75. She is so detail oriented and effective that when there were desk audits, Plaintiff was consulted. Moreover, Plaintiff received a raise as a result of one audit, because of her excellent performance in managing the system.

76. In early December 2003, Plaintiff verbally asked Mr. Ahmad Thabet, Deputy Director of Financial Operations (Egyptian) for a promotion to Assistant Director (M-2), in the Control Section Disbursement Division. Later that month, around Christmas, Mr. Thabet rejected her request for promotion. Mr. Thabet's reason for his rejection was because he needed to wait for the new Controller to be appointed, replacing Mr. Michael Pagani, who had retired.

77. At the end of December 2003, Plaintiff was advised by Mr. Pagani, that he recommended her for the position, prior to his retirement.

78. About 3 months later, on March 2, 2004, Plaintiff made a written request to Mr. Ahmad Thabet, Deputy Director of Financial Operations (Egyptian), for an upgrade to the position of Assistant Director (M-2), in the Control Section Disbursement Division.

79. In this request, Plaintiff outlined some of her contributions and achievements as Manager of Control since May 1993. The contributions and achievements included, but were not limited to:

1) Assistance in the design of the control system in Disbursement;
2) Implementation of the pilot program of reconciling Accounts Payable to General Ledger;
3) Implementation of the pilot program for the Accounts Payable-Imaging System;

4) The accomplishment of critical analysis and resolution of many systems and accounting problems;
5) The recommendation and implementation of all vendors with a tax IDs to reduce duplicate vendors;
6) The recommendation of valuable solutions for minimizing costs;
7) Major Contribution to the research of IRS and State tax codes and rules;
8) Direction of the staff in processing urgent requests timely during the system conversion to Oracle, while all other upper management were involved in another location, and amongst others;
9) The leadership of the special project in cutting down the Accounts Payable-Holds.

80. On that same day, March 2, 2004, Mr. Thabet denied Plaintiff's request on the grounds that there was no money for her promotion and that that position was eliminated.

81. However, in April 2004, Mr. Bernard Pigott was "temporarily" placed in Plaintiff's Department, and assigned to the disbursement division.

82. In June 2004, Mr. Pigott was placed in the M-2 position, the same position Plaintiff had requested, and was rejected for.

83. Mr. Pigott, is a White Italian male, who was not as qualified as Ms. Chin for the M-2 position. In addition, he did not have a college degree or (Accounts Payable) experience.

84. Plaintiff questioned Mr. Thabet about this troubling development, and was told that this was just a temporary arrangement until the new Controller was hired.

85. On October 5, 2004, Plaintiff complained to Mr. Thabet again about these troubling facts, which she felt to be discriminatory. He threatened her by telling her that she better not complain, it is a bad time to complain, that she has an M-1 managerial title and could be fired since managers don't have a Union. He also said, “Italians and Jews have power and connections.” Plaintiff continued to protest her discriminatory treatment.

86. On October 14, 2004, Mr. Thabet told Plaintiff that she is no longer in charge of the Control Group, and was reassigned to the Petty Cash Unit only.

87. Plaintiff was shocked because the Petty Cash Unit, is an entry level position, Plaintiff immediately complained about this retaliatory conduct.

88. On October 25, 2004, Plaintiff wrote to the new Controller, Mr. Pagelson outlining her contributions and background, explaining how the department has grown, her staff doubled, as well as her duties and responsibilities. She pointed out that with these developments and the reorganization of the departments, her title has remained the same, and once again requested an upgrade in the Analysis and Control Section.

89. On December 6, 2004, Plaintiff wrote to Mr. Pagelson, thanking him and Mr. Aaron Mittelman (White/Jewish), Deputy Director, for their compliments of her in regards to her achievements and success in implementation and continued management of the Financial Analysis and Internal Control Unit in Disbursement (Accounts Payable). The purpose of this letter was also to respond to the offer from Mr. Pagelson and Mr. Mittelman for a transfer without any upgrading.

90. Plaintiff expressed how her achievements and contributions have been well addressed; however, they have not been rewarded. Although she respected their recommendation for a transfer, she strongly believed that she should be given an opportunity for a promotion/upgrade in the area she has been assigned to for over 12 years. It is the area she is most familiar with and would be most effective in.

91. On the same day, Mr. Pagelson responded to Plaintiff's letter by thanking her for her suggestions and that the new position (transfer) in the Treasury Division would provide the clearest path for advancement.

92. After Plaintiff's several complaints, Mr. Thabet, continued his retaliation against her by demeaning her, undermining her authority, and taking away many of her supervisory responsibilities.

93. Other examples of his retaliatory conduct were: limiting Plaintiff's responsibilities and treating her as a Bookkeeper; limiting Plaintiff's access to important computer systems that she previously had access to; giving more training to her staff than her; communicating to her staff in the department without sending her a copy of the same communication or involving her in the process.

94. Mr. Thabet did not allow her to review her Senior staff's work, but held her responsible for their errors.

95. Mr. Thabet also retaliated against her by sending her out on jobs that are in essence, menial in nature.

96. The duties Plaintiff has been assigned to, in retaliation for her engagement in protected activity, are tantamount to a demotion.

97. For example, in the morning of August 3, 2005, Mr. Thabet informed Plaintiff that she was assigned to a "special project", and to report to the Capital Project-Administration to assist. Plaintiff went there and was told to come back at 2:00 p.m. Between 2:00-4:00 p.m., Plaintiff was told to wait for a report. At about 4:00 p.m., Plaintiff still did not receive said report. She was then told to return the next day for the report. She was effectively utilized as a messenger.

98. This demeaning and humiliating task could have been done by fax, mail, email, or by messenger, and did not require Plaintiff, who is a Manager of Financial Analysis and Internal Control, to personally pick it up.

99. On Monday, August 8, 2005, Plaintiff reported the details of her special project, which occurred on August 3 and 4 of 2005, to Mr. Jeffrey A. Pagelson, the new Controller.

100. Another example of the retaliation and degrading treatment was when Plaintiff was removed from handling important Freedom of Information Law, "FOIL" requests, and reassigned to retrieve reports.

101. On August 30, 2005, Plaintiff complained to Mr. Pagelson again and outlined in detail, the retaliatory adverse treatment she was receiving by Mr. Thabet.

102. As further retaliation, on November 10, 2005, Ms. Phyllis Call, Administrative Assistant to the Controller, emailed Plaintiff, informing her of her permanent transfer date of November 28, 2005.

103. The current transfer has caused Plaintiff tremendous hardship. She has to commute two extra hours, and caused her to neglect her elderly father.

104. On November 23, 2005, Plaintiff wrote Mr. Pagelson, requesting that he reconsider this transfer based on the meeting they had on November 9, 2005.

105. On the evening of November 25, 2005, Ms. Chin received a letter from Dale Kutzbach, Director of Human Resources, dated November 23, 2005, informing her that there has been a reorganization of the Accounting and Fiscal Services Department.

106. In the same letter, Plaintiff was also informed that effective November 28, 2005, she will be reassigned to the Manhattan Management Department, located at 1980 Lexington Avenue, New York, N.Y., and that she is directed to report to Yvonne Rosado, Office Manager.

107. On December 5, 2005, Plaintiff complained to Mr. Tino Hernandez, the Chairman of NYCHA and Dale Kutzbach, Director of Human Resources, stating that her transfer is discriminatory and clearly retaliatory. She stated that she has been with the Housing Authority since 1981, and has been doing an excellent job as Administrative Accountant for almost 13 years.

108. Plaintiff also stated that she has been passed over for promotion to M-2 too many times. She also inquired about her unjustified transfer, and sought clarification regarding her seniority with the department. Less senior Managers, namely, Mr. Pigott (White/Italian) and Mr. Calandruccio (White/Italian), were not forced to transfer.

109. From 2002-2004, the following employees of Defendant have been promoted to M-2: 1) Salwa Hanna (Egyptian), 2) Moataz Edabie (Egyptian), 3) Salu (Skaria) Jacob (Egyptian), 4) Gisela Fornell (White/Spanish), 5) Kristie L. Maduro (White), 6) Jean Mondesir (White), 7) Margaret Farrell (White), 8) Louis Yeostros (White), 9) Linda McKay (White), 10) Hind Zaid (Egyptian), 11) Bernard Pigott (White/Italian), and 12) Philip Carlucci (White/Italian).

110. Upon information and belief, most of the above mentioned employees who were promoted, do not have degrees and/or degrees in accounting. Moreover, none of them are Chinese. Furthermore, none of these promotions were posted, as required by NYCHA policies and/or procedures.

111. Plaintiff did not volunteer for transfer. Rather, she vehemently objected to it, and was unjustifiably transferred to Harlem.

112. In her new position and location, Plaintiff's duties are those of a bookkeeper/clerk. Her day consists of reviewing invoices and inquiring whether they were paid.

113. Plaintiff's Agency complaints have been fruitless and she is suffering from stress, depression, and her obligations to her professional development and family have been adversely affected.

114. Upon information and belief, non-Chinese employees were not treated the same.

115. Plaintiff’s transfer by Defendant, and Defendant's failure to promote Plaintiff, was on account of her Race, Ethnicity/National Origin, and/or Retaliation for engaging in protected activity, in violation of Ms. Chin’s rights under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. §1981.

116. Defendant, NYCHA's disparate treatment of Plaintiff was intentional and unlawful and violated the provisions of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. §1981, which caused Plaintiff to suffer loss of income, pain and suffering, mental and emotional harm, other non-pecuniary losses, and incur legal fees and costs.

**AS FOR A SECOND CAUSE OF ACTION: NYSHRL Executive Law §§ 290 et seq.**
**(Race, National Origin Discrimination and/or Retaliation by Defendant NYCHA)**

117. Plaintiff repeats and re-avers each and every one of the allegations set forth in paragraphs 1 through 116 of this complaint with the same force and effect as if each was fully set forth herein.

118. Plaintiff is a Chinese woman, born in the country of China. As such she is a member of a protected class under the State laws.

119. Defendant violated §§ 290 et seq. when it continuously failed to promote her on account of her Race, Ethnicity/National Origin, and/or in Retaliation for engaging in protected activity. Defendant did this by continuously promoting several other non-Chinese employees, who were not as qualified as Plaintiff.

120. On December 21, 1981, Plaintiff was hired for the position of Assistant Accountant, by Defendant, New York City Housing Authority from a civil service list.

121. In 1982, after her probationary period, Plaintiff was promoted to a Civil Service Accountant position.

122. In 1989, Plaintiff was promoted to the position of Associate Accountant.

123. During her tenure, Plaintiff's time, attendance and work performance were and continue to be exemplary.

124. In 1991, Plaintiff observed that many non-Chinese outside applicants were appointed by Defendant Authority to M-1 level positions. Because of this, Plaintiff complained to Defendant's Office of Equal Opportunity ("OEO").

125. In 1993, due in part, to Ms. Chin's expertise and qualifications, she was promoted to an M-1 position.

126. One of Ms. Chin's first directives required that she develop an entirely new method for the reconciliation of reports. She also created the system reports which are still significant today, as they were converted to the new system named Oracle.

127. The following are the qualification requirements for the position of Administrative Accountant according to Defendant:

1) A baccalaureate degree from an accredited college including or supplemented by 24 credits in accounting, including one course each in advanced accounting, auditing, and cost accounting and four years of satisfactory full-time professional accounting or auditing experience, at least 18 months of which must have been in an administrative, managerial or executive capacity or supervising a staff performing accounting or auditing work; or

2) A valid New York State Certified Public Accountant license and at least 18 months of satisfactory full-time

> professional accounting or auditing experience in an administrative, managerial or executive capacity or supervising a staff performing accounting or auditing work.

128. Ms. Chin more than satisfies the above mentioned requirements. She has been an Accountant since 1981, almost 25 years. She holds a Bachelor's of Science Degree in Accounting from Brooklyn College. Moreover, she has almost 13 years of successful and extensive experience in management within the accounting field.

129. Plaintiff's responsibilities and duties as an Administrative Accountant include: analyzing and searching the Financial Management Systems, "FMS". She has also been able to avoid and control the errors and problems that occur. The methods she utilized include her own invented processes. For example, Plaintiff created the Open Batch Report, Missing Order Number Report, Invoices Open More Than Two Days Report, Effective Date Error Report, CN Report by Locations, Insufficient (R&I) Report by Locations and by Borough, Summary Report by Borough and User By ID Report.

130. She is so detail oriented and effective that when there were desk audits, Plaintiff was consulted. Moreover, Plaintiff received a raise as a result of one audit, because of her excellent performance in managing the system.

131. In early December 2003, Plaintiff verbally asked Mr. Ahmad Thabet, Deputy Director of Financial Operations (Egyptian) for a promotion to Assistant Director (M-2), in the Control Section Disbursement Division. Later that month, around Christmas, Mr. Thabet rejected her request for promotion. Mr. Thabet's reason for his rejection was because he needed to wait for the new Controller to be appointed, replacing Mr. Michael Pagani, who had retired.

132. At the end of December 2003, Plaintiff was advised by Mr. Pagani, that he recommended her for the position, prior to his retirement.

133. About 3 months later, on March 2, 2004, Plaintiff made a written request to Mr. Ahmad Thabet, Deputy Director of Financial Operations (Egyptian), for an upgrade to the position of Assistant Director (M-2), in the Control Section Disbursement Division.

134. In this request, Plaintiff outlined some of her contributions and achievements as Manager of Control since May 1993. The contributions and achievements included, but were not limited to:

1) Assistance in the design of the control system in Disbursement;
2) Implementation of the pilot program of reconciling Accounts Payable to General Ledger;
3) Implementation of the pilot program for the Accounts Payable-Imaging System;
4) The accomplishment of critical analysis and resolution of many systems and accounting problems;
5) The recommendation and implementation of all vendors with a tax IDs to reduce duplicate vendors;
6) The recommendation of valuable solutions for minimizing costs;
7) Major Contribution to the research of IRS and State tax codes and rules;
8) Direction of the staff in processing urgent requests timely during the system conversion to Oracle, while all other upper management were involved in another location, and amongst others;
9) The leadership of the special project in cutting down the Accounts Payable-Holds.

135. On that same day, March 2, 2004, Mr. Thabet denied Plaintiff's request on the grounds that there was no money for her promotion and that that position was eliminated.

136. However, in April 2004, Mr. Bernard Pigott was "temporarily" placed in Plaintiff's Department, and assigned to the disbursement division.

137. In June 2004, Mr. Pigott was placed in the M-2 position, the same position Plaintiff had requested, and was rejected for.

138. Mr. Pigott, is a White Italian male, who was not as qualified as Ms. Chin for the M-2 position. In addition, he did not have a college degree or (Accounts Payable) experience.

139. Plaintiff questioned Mr. Thabet about this troubling development, and was told that this was just a temporary arrangement until the new Controller was hired.

140. On October 5, 2004, Plaintiff complained to Mr. Thabet again about these troubling facts, which she felt to be discriminatory. He threatened her by telling her that she better not complain, it is a bad time to complain, that she has an M-1 managerial title and could be fired since managers don't have a Union. He also said, "Italians and Jews have power and connections." Plaintiff continued to protest her discriminatory treatment.

141. On October 14, 2004, Mr. Thabet told Plaintiff that she is no longer in charge of the Control Group, and was reassigned to the Petty Cash Unit only.

142. Plaintiff was shocked because the Petty Cash Unit, is an entry level position, Plaintiff immediately complained about this retaliatory conduct.

143. On October 25, 2004, Plaintiff wrote to the new Controller, Mr. Pagelson outlining her contributions and background, explaining how the department has grown, her staff doubled, as well as her duties and responsibilities. She pointed out that with these developments and the reorganization of the departments, her title has remained the same, and once again requested an upgrade in the Analysis and Control Section.

144. On December 6, 2004, Plaintiff wrote to Mr. Pagelson, thanking him and Mr. Aaron Mittelman (White/Jewish), Deputy Director, for their compliments of her in regards to her achievements and success in implementation and continued management of the Financial Analysis and Internal Control Unit in Disbursement (Accounts Payable).

The purpose of this letter was also to respond to the offer from Mr. Pagelson and Mr. Mittelman for a transfer without any upgrading.

145. Plaintiff expressed how her achievements and contributions have been well addressed; however, they have not been rewarded. Although she respected their recommendation for a transfer, she strongly believed that she should be given an opportunity for a promotion/upgrade in the area she has been assigned to for over 12 years. It is the area she is most familiar with and would be most effective in.

146. On the same day, Mr. Pagelson responded to Plaintiff's letter by thanking her for her suggestions and that the new position (transfer) in the Treasury Division would provide the clearest path for advancement.

147. After Plaintiff's several complaints, Mr. Thabet, continued his retaliation against her by demeaning her, undermining her authority, and taking away many of her supervisory responsibilities.

148. Other examples of his retaliatory conduct were: limiting Plaintiff's responsibilities and treating her as a Bookkeeper; limiting Plaintiff's access to important computer systems that she previously had access to; giving more training to her staff than her; communicating to her staff in the department without sending her a copy of the same communication or involving her in the process.

149. Mr. Thabet did not allow her to review her Senior staff's work, but held her responsible for their errors.

150. Mr. Thabet also retaliated against her by sending her out on jobs that are in essence, menial in nature.

151. The duties Plaintiff has been assigned to, in retaliation for her engagement in protected activity, are tantamount to a demotion.

152. For example, in the morning of August 3, 2005, Mr. Thabet informed Plaintiff that she was assigned to a "special project", and to report to the Capital Project-Administration to assist. Plaintiff went there and was told to come back at 2:00 p.m. Between 2:00-4:00 p.m., Plaintiff was told to wait for a report. At about 4:00 p.m., Plaintiff still did not receive said report. She was then told to return the next day for the report. She was effectively utilized as a messenger.

153. This demeaning and humiliating task could have been done by fax, mail, email, or by messenger, and did not require Plaintiff, who is a Manager of Financial Analysis and Internal Control, to personally pick it up.

154. On Monday, August 8, 2005, Plaintiff reported the details of her special project, which occurred on August 3 and 4 of 2005, to Mr. Jeffrey A. Pagelson, the new Controller.

155. Another example of the retaliation and degrading treatment was when Plaintiff was removed from handling important Freedom of Information Law, "FOIL" requests, and reassigned to retrieve reports.

156. On August 30, 2005, Plaintiff complained to Mr. Pagelson again and outlined in detail, the retaliatory adverse treatment she was receiving by Mr. Thabet.

157. As further retaliation, on November 10, 2005, Ms. Phyllis Call, Administrative Assistant to the Controller, emailed Plaintiff, informing her of her permanent transfer date of November 28, 2005.

158. The current transfer has caused Plaintiff tremendous hardship. She has to commute two extra hours, and caused her to neglect her elderly father.

159. On November 23, 2005, Plaintiff wrote Mr. Pagelson, requesting that he reconsider this transfer based on the meeting they had on November 9, 2005.

160. On the evening of November 25, 2005, Ms. Chin received a letter from Dale Kutzbach, Director of Human Resources, dated November 23, 2005, informing her that there has been a reorganization of the Accounting and Fiscal Services Department.

161. In the same letter, Plaintiff was also informed that effective November 28, 2005, she will be reassigned to the Manhattan Management Department, located at 1980 Lexington Avenue, New York, N.Y., and that she is directed to report to Yvonne Rosado, Office Manager.

162. On December 5, 2005, Plaintiff complained to Mr. Tino Hernandez, the Chairman of NYCHA and Dale Kutzbach, Director of Human Resources, stating that her transfer is discriminatory and clearly retaliatory. She stated that she has been with the Housing Authority since 1981, and has been doing an excellent job as Administrative Accountant for almost 13 years.

163. Plaintiff also stated that she has been passed over for promotion to M-2 too many times. She also inquired about her unjustified transfer, and sought clarification regarding her seniority with the department. Less senior Managers, namely, Mr. Pigott (White/Italian) and Mr. Calandruccio (White/Italian), were not forced to transfer.

164. From 2002-2004, the following employees of Defendant have been promoted to M-2: 1) Salwa Hanna (Egyptian), 2) Moataz Edabie (Egyptian), 3) Salu (Skaria) Jacob (Egyptian), 4) Gisela Fornell (White/Spanish), 5) Kristie L. Maduro (White), 6) Jean

Mondesir (White), 7) Margaret Farrell (White), 8) Louis Yeostros (White), 9) Linda McKay (White), 10) Hind Zaid (Egyptian), 11) Bernard Pigott (White/Italian), and 12) Philip Carlucci (White/Italian).

165. Upon information and belief, most of the above mentioned employees who were promoted, do not have degrees and/or degrees in accounting. Moreover, none of them are Chinese. Furthermore, none of these promotions were posted, as required by NYCHA policies and/or procedures.

166. Plaintiff did not volunteer for transfer. Rather, she vehemently objected to it, and was unjustifiably transferred to Harlem.

167. In her new position and location, Plaintiff's duties are those of a bookkeeper/clerk. Her day consists of reviewing invoices and inquiring whether they were paid.

168. Plaintiff's Agency complaints have been fruitless and she is suffering from stress, depression, and her obligations to her professional development and family have been adversely affected.

169. Upon information and belief, non-Chinese employees were not treated the same.

170. Plaintiff’s transfer by Defendant, and Defendant's failure to promote Plaintiff, was on account of her Race, National Origin and/or Retaliation, in violation of State laws.

171. Defendant, NYCHA's disparate treatment of Plaintiff was intentional and unlawful and violated the provisions of the New York State Human Rights Law, Executive Law §§ 290 et seq. (the “Human Rights Law”), which caused Plaintiff to suffer loss of income, pain and suffering, mental and emotional harm, other non-pecuniary losses, and incur legal fees and costs.

**AS FOR A THIRD CAUSE OF ACTION: NYCHRL Administrative Code §§ 8-101 et seq.**
**(Race and/or National Origin Discrimination and Retaliation by Defendant NYCHA)**

172. Plaintiff repeats and re-avers each and every one of the allegations set forth in paragraphs 1 through 171 of this complaint with the same force and effect as if each was fully set forth herein.

173. Plaintiff is a Chinese woman, born in the country of China. As such she is a member of a protected class under the City laws.

174. Defendant violated §§ 8-101 et seq. when it continuously failed to promote her on account of her Race, Ethnicity/National Origin, and/or in Retaliation for engaging in protected activity. Defendant did this by continuously promoting several other non-Chinese employees, who were not as qualified as Plaintiff.

175. On December 21, 1981, Plaintiff was hired for the position of Assistant Accountant, by Defendant, New York City Housing Authority from a civil service list.

176. In 1982, after her probationary period, Plaintiff was promoted to a Civil Service Accountant position.

177. In 1989, Plaintiff was promoted to the position of Associate Accountant.

178. During her tenure, Plaintiff's time, attendance and work performance were and continue to be exemplary.

179. In 1991, Plaintiff observed that many non-Chinese outside applicants were appointed by Defendant Authority to M-1 level positions. Because of this, Plaintiff complained to Defendant's Office of Equal Opportunity ("OEO").

180. In 1993, due in part, to Ms. Chin's expertise and qualifications, she was promoted to an M-1 position.

181. One of Ms. Chin's first directives required that she develop an entirely new method for the reconciliation of reports. She also created the system reports which are still significant today, as they were converted to the new system named Oracle.

182. The following are the qualification requirements for the position of Administrative Accountant according to Defendant:

1) A baccalaureate degree from an accredited college including or supplemented by 24 credits in accounting, including one course each in advanced accounting, auditing, and cost accounting and four years of satisfactory full-time professional accounting or auditing experience, at least 18 months of which must have been in an administrative, managerial or executive capacity or supervising a staff performing accounting or auditing work; or

2) A valid New York State Certified Public Accountant license and at least 18 months of satisfactory full-time professional accounting or auditing experience in an administrative, managerial or executive capacity or supervising a staff performing accounting or auditing work.

183. Ms. Chin more than satisfies the above mentioned requirements. She has been an Accountant since 1981, almost 25 years. She holds a Bachelor's of Science Degree in Accounting from Brooklyn College. Moreover, she has almost 13 years of successful and extensive experience in management within the accounting field.

184. Plaintiff's responsibilities and duties as an Administrative Accountant include: analyzing and searching the Financial Management Systems, "FMS". She has also been able to avoid and control the errors and problems that occur. The methods she utilized include her own invented processes. For example, Plaintiff created the Open Batch Report, Missing Order Number Report, Invoices Open More Than Two Days Report,

Effective Date Error Report, CN Report by Locations, Insufficient (R&I) Report by Locations and by Borough, Summary Report by Borough and User By ID Report.

185. She is so detail oriented and effective that when there were desk audits, Plaintiff was consulted. Moreover, Plaintiff received a raise as a result of one audit, because of her excellent performance in managing the system.

186. In early December 2003, Plaintiff verbally asked Mr. Ahmad Thabet, Deputy Director of Financial Operations (Egyptian) for a promotion to Assistant Director (M-2), in the Control Section Disbursement Division. Later that month, around Christmas, Mr. Thabet rejected her request for promotion. Mr. Thabet's reason for his rejection was because he needed to wait for the new Controller to be appointed, replacing Mr. Michael Pagani, who had retired.

187. At the end of December 2003, Plaintiff was advised by Mr. Pagani, that he recommended her for the position, prior to his retirement.

188. About 3 months later, on March 2, 2004, Plaintiff made a written request to Mr. Ahmad Thabet, Deputy Director of Financial Operations (Egyptian), for an upgrade to the position of Assistant Director (M-2), in the Control Section Disbursement Division.

189. In this request, Plaintiff outlined some of her contributions and achievements as Manager of Control since May 1993. The contributions and achievements included, but were not limited to:

1) Assistance in the design of the control system in Disbursement;
2) Implementation of the pilot program of reconciling Accounts Payable to General Ledger;
3) Implementation of the pilot program for the Accounts Payable-Imaging System;
4) The accomplishment of critical analysis and resolution of many systems and accounting problems;

5) The recommendation and implementation of all vendors with a tax IDs to reduce duplicate vendors;
6) The recommendation of valuable solutions for minimizing costs;
7) Major Contribution to the research of IRS and State tax codes and rules;
8) Direction of the staff in processing urgent requests timely during the system conversion to Oracle, while all other upper management were involved in another location, and amongst others;
9) The leadership of the special project in cutting down the Accounts Payable-Holds.

190. On that same day, March 2, 2004, Mr. Thabet denied Plaintiff's request on the grounds that there was no money for her promotion and that that position was eliminated.

191. However, in April 2004, Mr. Bernard Pigott was "temporarily" placed in Plaintiff's Department, and assigned to the disbursement division.

192. In June 2004, Mr. Pigott was placed in the M-2 position, the same position Plaintiff had requested, and was rejected for.

193. Mr. Pigott, is a White Italian male, who was not as qualified as Ms. Chin for the M-2 position. In addition, he did not have a college degree or (Accounts Payable) experience.

194. Plaintiff questioned Mr. Thabet about this troubling development, and was told that this was just a temporary arrangement until the new Controller was hired.

195. On October 5, 2004, Plaintiff complained to Mr. Thabet again about these troubling facts, which she felt to be discriminatory. He threatened her by telling her that she better not complain, it is a bad time to complain, that she has an M-1 managerial title and could be fired since managers don't have a Union. He also said, “Italians and Jews have power and connections.” Plaintiff continued to protest her discriminatory treatment.

196. On October 14, 2004, Mr. Thabet told Plaintiff that she is no longer in charge of the Control Group, and was reassigned to the Petty Cash Unit only.

197. Plaintiff was shocked because the Petty Cash Unit, is an entry level position, Plaintiff immediately complained about this retaliatory conduct.

198. On October 25, 2004, Plaintiff wrote to the new Controller, Mr. Pagelson outlining her contributions and background, explaining how the department has grown, her staff doubled, as well as her duties and responsibilities. She pointed out that with these developments and the reorganization of the departments, her title has remained the same, and once again requested an upgrade in the Analysis and Control Section.

199. On December 6, 2004, Plaintiff wrote to Mr. Pagelson, thanking him and Mr. Aaron Mittelman (White/Jewish), Deputy Director, for their compliments of her in regards to her achievements and success in implementation and continued management of the Financial Analysis and Internal Control Unit in Disbursement (Accounts Payable). The purpose of this letter was also to respond to the offer from Mr. Pagelson and Mr. Mittelman for a transfer without any upgrading.

200. Plaintiff expressed how her achievements and contributions have been well addressed; however, they have not been rewarded. Although she respected their recommendation for a transfer, she strongly believed that she should be given an opportunity for a promotion/upgrade in the area she has been assigned to for over 12 years. It is the area she is most familiar with and would be most effective in.

201. On the same day, Mr. Pagelson responded to Plaintiff's letter by thanking her for her suggestions and that the new position (transfer) in the Treasury Division would provide the clearest path for advancement.

202. After Plaintiff's several complaints, Mr. Thabet, continued his retaliation against her by demeaning her, undermining her authority, and taking away many of her supervisory responsibilities.

203. Other examples of his retaliatory conduct were: limiting Plaintiff's responsibilities and treating her as a Bookkeeper; limiting Plaintiff's access to important computer systems that she previously had access to; giving more training to her staff than her; communicating to her staff in the department without sending her a copy of the same communication or involving her in the process.

204. Mr. Thabet did not allow her to review her Senior staff's work, but held her responsible for their errors.

205. Mr. Thabet also retaliated against her by sending her out on jobs that are in essence, menial in nature.

206. The duties Plaintiff has been assigned to, in retaliation for her engagement in protected activity, are tantamount to a demotion.

207. For example, in the morning of August 3, 2005, Mr. Thabet informed Plaintiff that she was assigned to a "special project", and to report to the Capital Project-Administration to assist. Plaintiff went there and was told to come back at 2:00 p.m. Between 2:00-4:00 p.m., Plaintiff was told to wait for a report. At about 4:00 p.m., Plaintiff still did not receive said report. She was then told to return the next day for the report. She was effectively utilized as a messenger.

208. This demeaning and humiliating task could have been done by fax, mail, email, or by messenger, and did not require Plaintiff, who is a Manager of Financial Analysis and Internal Control, to personally pick it up.

209. On Monday, August 8, 2005, Plaintiff reported the details of her special project, which occurred on August 3 and 4 of 2005, to Mr. Jeffrey A. Pagelson, the new Controller.

210. Another example of the retaliation and degrading treatment was when Plaintiff was removed from handling important Freedom of Information Law, "FOIL" requests, and reassigned to retrieve reports.

211. On August 30, 2005, Plaintiff complained to Mr. Pagelson again and outlined in detail, the retaliatory adverse treatment she was receiving by Mr. Thabet.

212. As further retaliation, on November 10, 2005, Ms. Phyllis Call, Administrative Assistant to the Controller, emailed Plaintiff, informing her of her permanent transfer date of November 28, 2005.

213. The current transfer has caused Plaintiff tremendous hardship. She has to commute two extra hours, and caused her to neglect her elderly father.

214. On November 23, 2005, Plaintiff wrote Mr. Pagelson, requesting that he reconsider this transfer based on the meeting they had on November 9, 2005.

215. On the evening of November 25, 2005, Ms. Chin received a letter from Dale Kutzbach, Director of Human Resources, dated November 23, 2005, informing her that there has been a reorganization of the Accounting and Fiscal Services Department.

216. In the same letter, Plaintiff was also informed that effective November 28, 2005, she will be reassigned to the Manhattan Management Department, located at 1980 Lexington Avenue, New York, N.Y., and that she is directed to report to Yvonne Rosado, Office Manager.

217. On December 5, 2005, Plaintiff complained to Mr. Tino Hernandez, the Chairman of NYCHA and Dale Kutzbach, Director of Human Resources, stating that her transfer is discriminatory and clearly retaliatory. She stated that she has been with the Housing Authority since 1981, and has been doing an excellent job as Administrative Accountant for almost 13 years.

218. Plaintiff also stated that she has been passed over for promotion to M-2 too many times. She also inquired about her unjustified transfer, and sought clarification regarding her seniority with the department. Less senior Managers, namely, Mr. Pigott (White/Italian) and Mr. Calandruccio (White/Italian), were not forced to transfer.

219. From 2002-2004, the following employees of Defendant have been promoted to M-2: 1) Salwa Hanna (Egyptian), 2) Moataz Edabie (Egyptian), 3) Salu (Skaria) Jacob (Egyptian), 4) Gisela Fornell (White/Spanish), 5) Kristie L. Maduro (White), 6) Jean Mondesir (White), 7) Margaret Farrell (White), 8) Louis Yeostros (White), 9) Linda McKay (White), 10) Hind Zaid (Egyptian), 11) Bernard Pigott (White/Italian), and 12) Philip Carlucci (White/Italian).

220. Upon information and belief, most of the above mentioned employees who were promoted, do not have degrees and/or degrees in accounting. Moreover, none of them are Chinese. Furthermore, none of these promotions were posted, as required by NYCHA policies and/or procedures.

221. Plaintiff did not volunteer for transfer. Rather, she vehemently objected to it, and was unjustifiably transferred to Harlem.

222. In her new position and location, Plaintiff's duties are those of a bookkeeper/clerk. Her day consists of reviewing invoices and inquiring whether they were paid.

223. Plaintiff's Agency complaints have been fruitless and she is suffering from stress, depression, and her obligations to her professional development and family have been adversely affected.

224. Upon information and belief, non-Chinese employees were not treated the same.

225. Plaintiff’s transfer by Defendant, and Defendant's failure to promote Plaintiff, was on account of her Race, National Origin and/or Retaliation, in violation of the NYC Human Rights Laws.

226. Defendant, NYCHA's disparate treatment of Plaintiff was intentional and unlawful and violated the provisions of the New York City Human Rights Law, Administrative Code §§ 8-101 et seq. (the “Code”), which caused Plaintiff to suffer loss of income, pain and suffering, mental and emotional harm, other non-pecuniary losses, and incur legal fees and costs.

227. As a result of the foregoing, plaintiff demands judgment against Defendant for an award of injunctive relief that she be transferred back to her original location, and promoted to Assistant Director (M-2), in the Quality Control Section Disbursement Division, awarded lost wages, and other non pecuniary forms of compensation, including, but not limited to pain and suffering damages, costs and disbursement.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, AMY CHIN, respectfully demands judgment and prays that this Court order:

(a) A declaratory judgment that Defendant, the New York City Housing Authority, through it agents, servants, or employees, discriminated and retaliated against Plaintiff on the basis of Plaintiff's Race, Ethnicity/National Origin in the terms, conditions, and privileges of employment in violation of 42 U.S.C. § 1981; the New York State Human Rights Law Section 296 et seq., and the New York City Human Rights Law, Administrative "Code Section 8-101 et seq.;

(b) Injunctive relief permanently restraining and enjoining Defendant from making employment decisions on the basis of the Race or Ethnicity/National Origin of its employees and monitoring this Defendant's employment practices;

(c) Requiring defendant to transfer Plaintiff back to her original location, and promote her to Assistant Director (M-2), in the Quality Control Section Disbursement Division, award Plaintiff with lost wages, and other non pecuniary forms of compensation, costs and disbursements that Plaintiff has suffered as a result of Defendant's unlawful discrimination and retaliation against her, together with all interest on said amounts;

(d) Requiring Defendant to pay all compensatory damages, including but limited to the pain and suffering she was caused, by Defendant's disparate treatment of her;

(e) Requiring Defendant to pay to Plaintiff all reimbursable expenses;

(f) Requiring Defendant to pay under 42 U.S.C. § 1981, the New York City Code and all other applicable statutes, reasonable attorney's fees and costs of this action; and

(g) such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury in this action.

Dated: New York, New York
February 8, 2006

Respectfully submitted,
Law Offices of LEE NUWESRA

**By:** ______________________________

Lee Nuwesra (LN 5851)
Venessa D. Melly (VM 5438)
Attorneys for Plaintiff
60 East 42nd Street, Suite 838
New York, New York 10017
(212) 682-0655

This document was created with Win2PDF available at http://www.daneprairie.com.
The unregistered version of Win2PDF is for evaluation or non-commercial use only.