UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMY CHIN,

                              Plaintiff,

         -against-

NEW YORK CITY HOUSING AUTHORITY,

                       Defendant.

06 Civ. 1437 (RJH) (GWG)

**<u>MEMORANDUM OPINION
AND ORDER</u>**

           Defendant New York City Housing Authority ("NYCHA") moves for summary judgment pursuant to Rule 56, Fed. R. Civ. P., on plaintiff Amy Chin's claims under 42 U.S.C. § 1981 ("Section 1981"), N.Y. Exec. Law § 296, and N.Y.C. Admin. Code § 8-101 *et seq.* Plaintiff claims that defendant is liable for several alleged acts of racial discrimination and retaliation committed against her by her superiors—employees of defendant—including allegedly denying promotions to her and ultimately transferring her to another division to work a "dead end" job because she is Chinese. Given the material issues of fact regarding plaintiff's performance and the acts and decisions of defendant's employees, summary judgment would ordinarily be unwarranted. However, defendant's motion is granted herein because municipal liability under Section 1981 attaches only if the acts at issue can properly be identified as the policy or custom of the municipality, and the evidence submitted cannot support this inference. Further, in the absence of a federal claim, the court declines to exercise supplemental jurisdiction over plaintiff's state law claims.

# BACKGROUND

Plaintiff has worked for defendant in various capacities since December 21, 1981. (Defendant's Rule 56.1 Statement ("Def. 56.1 Statement") ¶ 1; Plaintiff's Affidavit ("Pl. Aff.") ¶ 3.) She began as an Assistant Accountant in the Design Department and was subsequently promoted in 1993 to Administrative Accountant, an "M-1"[1] management position in the Disbursements Division of the Financial Operations Department. (Def. 56.1 Statement ¶¶ 1-2; Pl. Aff. ¶¶ 3, 5.) Plaintiff remained in the latter position until her transfer to NYCHA's Operations Division in November 2005. (Def 56.1 Statement ¶ 41; Chin Dep. at 164-66.) The conduct that is the subject of this action began in 2002 and allegedly continues to this day.[2] (Pl. Br. at 1.)

*Plaintiff's First Application for Promotion*

In August 2003, plaintiff's immediate supervisor, Ahmed Thabet, was promoted from his M-2 position of Assistant Director of the Control Section of the Disbursements Division of the Financial Operations Department to an M-3 position as Deputy Director of the Disbursements Division. (Def 56.1 Statement ¶ 7.) Shortly after Thabet's promotion, the Director of the Financial Operations Department, Michael

---

[1] The designations "M-1", "M-2", "M-3", etc., are civil service levels, not titles, corresponding generally to increased salary and greater responsibility. (Kutzbach Dep. at 18.)

[2] Plaintiff makes explicit in her response to this motion that the "conduct that gave rise to Plaintiff [sic] Discrimination and Retaliation claims began in 2002 . . . ." (Pl. Br. at 1.) As "background information", however, plaintiff cites two complaints she made to the NYCHA's Department of Equal Opportunity ("DEO") one in the early 1990s and one in 2001. (Pl. Br. at 1; Def. 56.1 Statement ¶ 3; Pl. Aff. ¶ 4.) The first complaint alleged that plaintiff had not been considered for promotional opportunities because she was Chinese, while the second complaint alleged that her immediate supervisor at the time, Ahmad Thabet, had discriminated against her because of her race and gender. (Def. 56.1 Statement ¶ 3; Pl. Aff. ¶ 4.) In each case, the DEO determined that her complaint was without merit.

Pagani, retired.  (Def 56.1 Statement ¶ 10; Pl. Aff. ¶ 10.)  Before leaving, however, Pagani told plaintiff that he would recommend her to replace Mr. Thabet. (Pl. Aff. ¶ 9-10.)

Plaintiff subsequently asked Thabet, now Deputy Director of the Disbursements Division, for a promotion to Assistant Director of the Control Section, first orally in December 2003 and then in writing in March 2004.  (Def 56.1 Statement ¶¶ 11-12; Pl. Aff. ¶ 11-12.)  Plaintiff and Thabet dispute how Thabet responded to plaintiff's requests.  According to plaintiff, Thabet told her that the position was open, but that he had to wait for Mr. Pagani's replacement.  (Pl. Aff. ¶ 11.)  Mr. Thabet claims that he never said there was an open position to which plaintiff could be promoted, and that in fact he had told her the opposite.  (Thabet Aff. ¶ 12.)  Plaintiff also claims that following her written request for promotion, Thabet called her into his office and responded to her questions about why a co-worker was promoted to an unrelated position by telling her that "You don't know that only the Jews and Italian have the power now.  You better not complain."  (Chin Dep. at 65.)  Paradoxically, it appears that Thabet himself is Egyptian and neither Jewish nor (obviously) Italian.  (Thabet Dep. at 11-12.)  In any event, Thabet denies he made such remarks.  (Thabet Supp. Aff. ¶¶ 3-4.)  Lastly, Thabet and Plaintiff dispute who performed Thabet's former duties as Assistant Director following his promotion, with plaintiff claiming she did and Thabet claiming he did.  (Thabet Aff. ¶ 8, 12; Pl. Aff. ¶ 22.)

In April 2004, the interim Director of the Financial Operations Department, Kirit Pamchamia, assigned Bernard Pigott to Thabet's former position of Assistant Director.  (Def 56.1 Statement ¶ 20.)  Pamchamia did not give Pigott a salary

increase for this assignment because Mr. Pigott had previously been an Assistant Director in another division of the NYCHA, and the assignment constituted a simple transfer. (*Id.* at ¶¶ 18, 20.) Based on her personal experience with him, plaintiff concluded that Pigott was grossly underqualified for the position. (Chin Dep. at 279-80.)

In October 2004, plaintiff complained to Thabet about the appointment of Pigott. (Def 56.1 Statement ¶ 25.) Thabet and plaintiff again dispute the substance her complaint. Thabet claims that plaintiff said Pigott was an "outsider" and that she was more deserving of promotion, while plaintiff claims that she explicitly told Thabet that she thought Pigott's assignment was racially motivated. (Thabet Aff. ¶ 20; Pl. Aff. ¶ 24.)

*Defendant's Early Attempts to Reassign Plaintiff*

In July 2004, Jeffrey Pagelson was appointed NYCHA's Controller and took over Mr. Pagani's responsibilities. (Def 56.1 Statement ¶ 24.) On October 14, 2004, Mr. Thabet, after consulting with Pagelson, directed plaintiff to take a new position in the Petty Cash and Employee Unit of the Purchase Order Section of the Disbursements Division. (Def 56.1 Statement ¶ 26; Chin Dep. 72-76.) The parties dispute the nature of the position in Petty Cash, with defendant describing it as "managerial" and involving "important responsibility", and plaintiff describing it as non-managerial and consisting mainly of clerical work. (Def 56.1 Statement ¶ 26; Chin Dep. 72-76.) When she received the directive from Thabet, plaintiff immediately called Lorraine Glover, secretary to NYCHA Commissioner Andrew, and asked for advice regarding how best to protest the assignment. (Chin Dep. at 78-80.) Ms. Glover recommended that plaintiff speak with Mr. Pagelson directly, and plaintiff did subsequently make an appointment

with Mr. Pagelson. (*Id.*) When plaintiff spoke with Pagelson in person, he told her he was not proceeding with the reassignment, and indeed, he did not. (Def 56.1 Statement ¶ 30; Chin Dep. at 80.)

In November 2004, Pagelson and Aaron Mittelman, the Deputy Director of the Treasury Division, offered plaintiff a position in the Treasury Division running a control unit similar to the one she ran in the Disbursements Division. (Def 56.1 Statement ¶ 32.) Pagelson claims that, at the time, he believed that the reassignment would be a good career move for plaintiff. (Pagelson Decl. ¶ 9.) In an e-mail dated December 6, 2004, Pagelson also indicated to plaintiff that the reassignment "would provide the clearest path for advancement." (Ex. B to Pagelson Decl.) Plaintiff, however, rejected the transfer. (Def 56.1 Statement ¶ 34.) Plaintiff claims that the reassignment would have put her in an "entry level position, with meaningless assignments and no supervisory responsibilities." (Pl. Aff. ¶ 25.) She nevertheless thanked Pagelson and urged him to reconsider her for a promotion within the division. (E-mail from Chin to Pagelson dated Dec. 6, 2004, Ex. B to Pagelson Decl.)

Finally, on August 3, 2005, again after discussion with Pagelson, Thabet assigned plaintiff and Bharat Shah, a staff member in the Accounts Payable Division, to provide temporary assistance to the Capital Projects Administration Unit ("CPAU"). (Def 56.1 Statement ¶ 35-36.) Plaintiff did make herself available for this assignment, but the assignment "did not work out" and her involvement with CPAU ended on August 5. (Def 56.1 Statement ¶ 35-36.) Plaintiff claims that the assignment consisted of meaningless work, such as running one or two reports in an area with which she was unfamiliar. (Chin's Dep. at 73-76.) Later that month, plaintiff again complained to

Pagelson, alleging "[racial] discrimination and retaliation" insofar as Thabet kept "sending [her] out to do lower level assignment[s]." (Chin Dep. at 139-40.) Without detailing specific instances, plaintiff further complained that Thabet had: (1) demeaned her in front of subordinates; (2) excluded her from management meetings; and (3) undermined her authority by giving tasks directly to employees she supervised. (Chin Dep. at 138-150.)

*Plaintiff's Ultimate Transfer Out of Finance*

In November 2005, Pagelson transferred plaintiff out of the Accounting and Fiscal Services Department and into Operations, a different department of the NYCHA. (Def 56.1 Statement ¶ 41.) Pagelson claims he had decided "as early as the end of 2004/beginning of 2005" that plaintiff was a candidate for transfer out of his department because in resisting or turning down earlier reassignments, she had shown "little interest in taking on new challenges to help the Department." (Pagelson Decl. ¶ 6.) Pagelson also claimed that plaintiff did not have "good leadership skills", was "resistant to change", and that transferring her would not negatively impact the department. (Pagelson Decl. ¶ 12.) Pagelson did not know "the specific field location within Operations to which plaintiff would be assigned." (Pagelson Decl. ¶ 13.) Pagelson transferred eleven other employees, including two managers, concurrently with plaintiff as part of a department restructuring. (Pagelson Decl. ¶ 14 and Ex. F.)

In her new position, plaintiff does not perform managerial functions or any of her previous work. (Chin Dep. at 15-18.) She works at a new location on Lexington Avenue that requires a longer commute. (Ex. G to Niederhoffer Decl.; Chin Dep. at 165-

66.)  Plaintiff complained again about the treatment she had received, this time to Tino

Hernandez, Chairman of the NYCHA, and Dale Kutzbach, Director of Human

Resources.  (E-mail from Chin to Hernandez and Kutzbach dated December 5, 2005, Ex.

8 to Nuwesra Aff.)  Plaintiff does not mention race in her complaint, but stated that "[i]t

is very unfair, and purely retaliation and discrimination from the Finance-Accounting and

Fiscal Services Department to give me such short . . . notice [of my transfer]", and

describing the hardship imposed by the longer commute.  (*Id*.)  Mr. Kutzbach claims he

did not consider the complaint to be about racial discrimination but rather about unfair

treatment generally.  (Kutzbach Dep. at 55.)  Less than three months after sending this e-

mail, plaintiff filed the instant action.


## DISCUSSION

### I.      Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment may be

granted "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ.

P. 56(c).  "The plain language of Rule 56(c) mandates the entry of summary judgment . . .

against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of

proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 321 (1986); *see also Distasio v.

Perkin Elmer Corp.,* 157 F.3d 55, 61 (2d Cir. 1998); *Conway v. Microsoft Corp.,* 414 F.

Supp. 2d 450, 458 (S.D.N.Y. 2006).  A party moving for summary judgment may

discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325.

A fact is considered "material" for purposes of Rule 56 if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Whether a material issue is "genuine" depends on whether the evidence is of a type that would permit a reasonable jury to return a verdict in favor of that party. *Mitchell v. Shane,* 350 F.3d 39, 47 (2d Cir. 2003). In making its showing that a genuine issue of material fact exists, the nonmoving party may not rely on "the mere existence of a scintilla of evidence" to support its position, but must instead proffer "evidence on which the jury could reasonably find for the [plaintiff]." *Dawson v. County of Westchester,* 373 F.3d 265, 272 (2d Cir. 2004) (citing *Anderson,* 477 U.S. at 252). Although "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," *Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir. 2001), it is "sparingly used where intent and state of mind are at issue because . . . careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination," *Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir. 2000) (citations omitted).


## II.     Municipal Liability under Section 1981

### A.     Municipal Liability Generally and "Final Policymakers"

A municipality can be liable for violating Section 1981 only if the injury at issue resulted from the execution of a racially[3] discriminatory "policy or custom".  *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989) (holding that because the "express 'action at law' provided by § 1983 . . . provides the exclusive federal damages remedy for [a] violation of the rights guaranteed by § 1981", plaintiff "must show that the violation of his 'right to make contracts' protected by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases"); *see also Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978) (holding that a local government may not be sued under 42 U.S.C § 1983 unless "execution of [the] government's policy or custom . . . inflicts the injury"); *Philippeaux v. N. Cent. Bronx Hosp.*, 871 F. Supp. 640, 656 (S.D.N.Y. 1994) (holding that the 1991 Congressional amendments to Section 1981 did not disturb *Jett*'s requirement that "plaintiff allege a violation of Section 1983 and meet the requirements of *Monell*").  Official policy traditionally takes the form of an "ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers", *Monell*, 436 U.S. at 690, while a qualifying custom consists of a "longstanding practice" that "constitutes the 'standard operating procedure' of the local governmental entity." *Jett*, 491 U.S. at 737.

While municipal policy is frequently set by a lawmaking body such as a city council, the acts and pronouncements of a single official may constitute policy for which the municipality is liable if that official is the "final policymaker" in the area at issue.  *St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion); *Jeffes v.*

---

[3] Section 1981 does not protect against discrimination based on national origin.  *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987).  Because defendant has not challenged plaintiff's action on the grounds that it alleges discrimination on the basis of national origin and not race, and because summary judgment is granted on alternate grounds, the court does not consider the issue.

*Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) ("The municipality cannot properly be held liable in such an action unless the 'injury was inflicted by [its] lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'") (quoting *Praprotnik*, 485 U.S. at 121-22). Importantly, however, municipalities are *not* vicariously liable for the actions of their employees under a theory of *respondeat superior*.[4] *Jett*, 491 U.S. at 735; *Monell*, 436 U.S. at 694; *Reynolds v. Giuliani*, 506 F.3d 183, 190 (2d Cir. 2007) ("*Monell* reasoned that § 1983 rejects the imposition of vicarious liability on a municipality for the torts of its employees as incompatible with § 1983's causation requirement"). Because liability hinges on the distinction between making policy and executing policy, when plaintiffs allege municipal liability for the actions of an individual, courts must pay special attention to the authority granted that individual and the theory of causation being offered. *See Praprotnik*, 485 U.S. at 126 (plurality) ("If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability."); *Bd. Of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 405 (1997) ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."). Whether or not a single individual possesses "final policymaking authority" is an issue of state law.

---

[4] The court observes that had plaintiff brought a Title VII claim instead of a Section 1981 claim, she might have survived this motion for summary judgment. The substantive elements of an employment discrimination claim under Title VII are identical to those under Section 1981, but unlike Section 1981, the principle of *respondeat superior* applies to Title VII claims. *See Murray v. New York Univ. Coll. of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995); *Philippeaux*, 871 F. Supp. at 654. Presumably plaintiff did not pursue a Title VII claim because she failed to file a charge of employment discrimination with the Equal Employment Opportunity Commission within the prescribed 180 days. 42 U.S.C. 2000e-5(f)(1); *Holt v. KMI-Continental Inc.*, 95 F.3d 123, 132 (2d Cir. 1996).

*Jett*, 491 U.S. at 737. An individual may possess such authority through an express legislative grant or by a delegation of authority from those who possessed it through an express legislative grant. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion) ("[a]uthority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority"); *Soto v. Schembri*, 960 F. Supp. 751, 757 (S.D.N.Y. 1997). The individual need not possess general policymaking authority, but rather only authority to formulate policy governing the particular conduct at issue. *Jeffes*, 208 F.3d at 57 ("[T]he official in question need not be a municipal policymaker for all purposes. Rather, with respect to the conduct challenged, he must be responsible under state law for making policy *in that area* of the [municipality's] business.") (quotes and citations omitted). Finally, it is for the court to decide whether an individual possessed final policymaking authority in a particular area. *Jett*, 491 U.S. at 737.

　　　　The critical characteristic of final policymakers when employment is at issue is whether the municipal official has authority to formulate the rules governing personnel decisions rather than authority to make decisions pursuant to those rules—e.g., the hiring and firing of subordinates. *See Pembaur*, 475 U.S. at 483 n.12 (plurality opinion) (noting that discretion to hire and fire municipal employees does not entail being the final policymaker for employment); *Hurdle v. Bd. of Educ. of the City of N.Y.*, 113 Fed. Appx. 423, 425-26 (2d Cir. 2004) (adopting *Pembaur* distinction between decisionmaking and policymaking and noting that "responsibility for making law or setting policy . . . is authority to adopt rules for the conduct of government") (quoting *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992)); *see also id.* (Superintendent not a

final policymaker in New York City on issue of transferring principals because transfer only authorized for reasons articulated by New York education law or upon request to the chancellor).

In *St. Louis v. Praprotnik*, a majority of the Supreme Court found no municipal liability for alleged retaliation against plaintiff by his supervisors because plaintiff's supervisors did not qualify as final policymakers for employment purposes. *Praprotnik*, 485 U.S. at 128-31 (plurality opinion); *id*. at 132 (Brennan, J., concurring in the judgment). The plaintiff in *Praprotnik* had worked for the City of St. Louis as an architect and had repeatedly complained to the City's Civil Service Commission about various actions taken by his superiors. *Id*. at 114-16. His supervisors initially only transferred him to another department, but he was there given "unchallenging clerical functions far below the level of responsibilities that he had previously enjoyed" and ultimately he was terminated from his new position. *Id*. at 115-16. A plurality of the Court found, however, that the Civil Service Commission, rather than plaintiff's supervisors, had the authority to set employment policy, that the policy in place prohibited retaliatory action, and that the City of St. Louis could not be liable for any deviations plaintiff's supervisors made from this policy. *Id.* at 127-30 ("When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality.")

In *Carrero v. New York City Housing Authority*, a case similar to *Praprotnik* and to the case at bar, plaintiff sued the NYCHA for gender discrimination under Title VII and Section 1983. *Carrero v. New York City Housing Authority*, 890

F.2d 569, 574 (2d Cir. 1989). Plaintiff had allegedly suffered repeated sexual harassment as well as unfavorable performance reviews from her supervisor, and claimed that the NYCHA was liable. *Id*. at 572-74. The Second Circuit held that while plaintiff's supervisor was liable under Section 1983, the NYCHA was not because her supervisor's actions "cannot fairly be attributable to Housing Authority practice or policy." *Id*. at 577. Her supervisor "exercised some discretion in training and evaluating [plaintiff]," but "discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Id*.

**B.** **Failure to Supervise**

While a municipality cannot be liable under Section 1981 when its only connection to the discriminatory or retaliatory acts at issue is that its employees committed such acts, a municipality can be liable if it "evinced such a deliberate indifference to the allegations of discrimination as to show that the defendant intended the discrimination to occur." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 128 (2d Cir. 2004) (quotations and citations omitted); *see also Reynolds*, 506 F.3d at 192 (noting that the deliberate indifference standard applies to a broad range of failure to supervise claims). To prove deliberate indifference, plaintiffs must demonstrate: (1) that municipal officials with final policymaking authority had notice of the illegal conduct; (2) that the need for corrective action was "obvious"; and (3) that officials nevertheless chose to ignore the issue. *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 128 (2d Cir. 2004) ("[P]laintiffs' evidence must establish . . . that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was 'obvious,' and the

policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction."); *Vann v. City of New York*, 72 F.3d 1040, 1051 (2d Cir. 1995) ("To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious.").  Notice of the illegal conduct must be sufficiently comprehensive to equate the policymaker's response with a "deliberate choice" among alternatives that is attributable to the municipality.  *See Amnesty Am.*, 361 F.3d at 125 ("where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may be properly thought of as a city 'policy or custom' that is actionable under § 1983").  Furthermore, evidence of mere negligent supervision is not sufficient.  *See id*. at 128.  Plaintiffs bear the burden of showing that upon notice of the illegal conduct, policymakers responded in a way that was "clearly unreasonable in light of the known circumstances."  *Back*, 365 F.3d at 127, 129.

When final policymakers have actual notice of illegal conduct, as when policymakers learn of repeated complaints through an established process, "deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."  *Vann*, 72 F.3d at 1051.  Actual notice, however, is not necessary, and evidence of a widespread practice of illegal conduct would constitute constructive notice sufficient to satisfy plaintiff's burden.  *Sorlucco v. New York City Police Dept.*, 971 F.2d 864, 871 (2d Cir. 1992) ("[B]efore the actions of subordinate city employees can give rise to § 1983 liability,

their discriminatory practice must be so manifest as to imply the constructive acquiescence of senior policy-making officials.").  Finally, while a single incident generally does not give rise to liability under a failure to supervise theory, if the need to take corrective action is sufficiently obvious, a municipality can be liable for a single instance of deliberate indifference.  *Amnesty Am.*, 361 F.3d at 127-28 (finding that a reasonable factfinder could conclude that police chief was deliberately indifferent to treatment of demonstrators by his subordinates because he "must have witnessed the violence and heard the [demonstrators'] screams").

In *Amnesty America*, an anti-abortion group sued the Town of West Hartford, Connecticut on behalf of its members.  *Amnesty Am.*, 361 F.3d at 117.  The group had presented evidence that on two occasions, the West Hartford police had used excessive force to arrest and disperse its members in plain view of the chief of police.  *Id.* at 118-20.  Protesters gave testimony that the chief of police was present while they screamed in pain on both occasions, and that the chief actually participated in the brutality on the second occasion, grabbing a protester's hair and pulling her neck back. *Id.*  The Second Circuit reversed the district court's grant of summary judgment for the Town.  *Id.* at 118.  The court held that the chief of police had final policymaking authority, and that there was ample evidence for a reasonable jury to conclude that there was an obvious need to better supervise the police on the protests, and that the chief's failure to stop the brutality constituted a deliberate choice to let it continue.  *Id.* at 127-128.

In contrast, in *Back v. Hastings on Hudson Union Free School District*, the Second Circuit affirmed summary judgment for the municipal defendant against a

school psychologist alleging gender discrimination. *Back*, 365 F.3d at 129. In *Back*, the plaintiff produced evidence that her immediate supervisors had given her poor performance reviews and recommended against her getting tenure solely because they did not think that she, as young mother, could handle the responsibilities of school psychologist. *Id*. at 114-17. Plaintiff complained to the School District's superintendent in two letters detailing specific comments plaintiff's supervisors had made concerning her inability to combine work and motherhood, and expressing her concern that her supervisors' negative input would unfairly taint her tenure review. *Id*. at 116. The superintendent interviewed plaintiff's supervisors, but ultimately he found her discrimination claim to be meritless, and plaintiff was denied tenure. *Id*. The Court held that while plaintiff could proceed against her supervisors, the grant of summary judgment for the Board of Education was proper. *Id*. at 130. The Board had final policymaking authority regarding her tenure, and did have notice of her complaints, but its response was not "clearly unreasonable" under the circumstances. *Id*. at 129.

## III. NYCHA Is Not Liable Under *Monell*

In her response to defendant's motion, plaintiff appears to make two arguments as to why NYCHA is liable under *Monell*. First, she argues that Pagelson had "final discretion and authority to make the decisions regarding Plaintiff's promotional opportunities and her subsequent transfer out of the Finance Department" and therefore that the NYCHA was liable for Mr. Pagelson's actions because he was a final policymaker for employment issues. Pl. Br. at 16. In the alternative, she argues that because the NYCHA "Chairman, Commissioner and/or Director of Human Resources"

failed to take corrective action and "allowed Mr. Pagelson's actions to continue unabated", the NYCHA is liable for failure to supervise its employees. Pl. Br. at 16. Both arguments fail. The first fails because Mr. Pagelson is not a final policymaker for employment matters at the NYCHA, and the second fails because plaintiff has adduced no evidence to support a failure to supervise by NYCHA policymakers.

### A. Pagelson Did Not Have Final Policymaking Authority

The identification of municipal officials with final policymaking authority is a legal question to be resolved by the court. *Jett*, 491 U.S. at 737; *Hurdle*, 113 Fed. App. at 425. The relevant state law indicates that the NYCHA's three-person Board of Commissioners and the Commissioner of Citywide Administrative Services are the only people expressly granted final policymaking authority in the area of employment at the NYCHA. *See Ramos v. City of New York*, No. 96 Civ. 3787 (DLC), 1997 WL 4104493, at *4 (S.D.N.Y. July 22, 1997) (holding that NYCHA Board had final policymaking authority). New York's public housing law creates the NYCHA, N.Y. PUB. HOUS. LAW § 400, vests it with a variety of generic powers, §§ 37, 401, and identifies the authority as consisting of three commissioners appointed by the mayor—one of which is designated as chairman. § 402(3). New York's Charter, however, specifically identifies the commissioner of Citywide Administrative Services as "responsible for citywide personnel matters." N.Y.C. CHART. § 811. The commissioner has the power to

> establish and enforce uniform procedures and standards to
> be utilized by city agencies in establishing measures,
> programs and plans to ensure a fair and effective
> affirmative employment plan for equal opportunity for
> minority group members and women who are employed by,
> or who seek employment with, city agencies.

§ 814(a)(12).  The actual "measures and programs" that govern employment practices in particular city agencies—here the NYCHA—are promulgated annually by the agency heads—here the NYCHA's Board of Commissioners—in "accordance with the uniform procedures and standards established by the department of citywide administrative services."  § 815(a)(19).  A copy of the NYCHA's specific policy was submitted by plaintiff in her response to this motion (Ex. 9 to Nuwesra Aff.), while a copy of the uniform procedures and standards can be found on the Department of Citywide Administrative Service's website at

http://www.nyc.gov/html/dcas/downloads/pdf/misc/eeo.pdf.  As noted above, these policies explicitly prohibit discrimination by race in all employment decisions.

Plaintiff does not argue that the commissioners delegated authority to Pagelson and there is no evidence in the record indicating such a delegation.  Instead, plaintiff argues that Mr. Pagelson was himself a final policymaker for personnel decisions and cites Mr. Lam, Mr. Kutzbach, and Mr. Pagelson's testimony that Pagelson had "final discretion and authority" to make promotion and transfer decisions for his subordinates.  Pl. Br. at 16.  Because the identification of final policymakers is a question of law, however, the opinions of Messrs Lam, Kurtzbach, and Pagelson on the matter are legally irrelevant.  *See Jett*, 491 U.S. at 737; *Hurdle*, 113 Fed. App. at 425.  Moreover, even if Pagelson had complete discretion to transfer or not transfer plaintiff, having this discretion would not make him a final policymaker but merely a final decisionmaker.  Even plaintiff appears to admit that Pagelson was not authorized to exercise his power arbitrarily.  Pl. Br. at 11.  Mr. Pagelson was constrained by the NYCHA's employment policies as promulgated by the commissioners.  Assuming *arguendo* that his treatment of

plaintiff violated those policies, such violation would constitute a deviation from agency policy rather than a reformulation. As discussed above, municipal agencies are not liable for employees' deviations from policy except in limited circumstances such as when the agency is liable for a failure to supervise. *Amnesty Am.*, 361 F.3d at 126; *Back*, 365 F.3d at 128.

### B.      Plaintiff Fails to Make Out a Case for a Failure to Supervise

Although never made explicitly, plaintiff appears to argue that the "Chairperson, Commissioner, and/or Director of Human Resources" were final policymakers at the NYCHA and that they were deliberately indifferent to the discrimination plaintiff suffered at the hands of Pagelson. *See* Pl. Br. at 16. To prove deliberate indifference, the plaintiff must cite to specific evidence supporting a reasonable inference that: (1) a final policymaker had notice of illegal conduct by subordinates; (2) the need for corrective action was obvious; and (3) the policymaker nevertheless chose to ignore the issue. *Amnesty Am.*, 361 F.3d at 128. Plaintiff has utterly failed, however, to produce any evidence that the NYCHA's Board of Commissioners had notice of even potentially illegal conduct, let alone evidence that the Board acted in way that reflected deliberate indifference to an obvious need for corrective action.

Nowhere does the plaintiff cite to evidence that the Board of Commissioners had notice of Mr. Pagelson or Mr. Thabet's allegedly discriminatory conduct. Plaintiff might cite to the December 5, 2005 e-mail she sent to the NYCHA Chairman and the Director of Human Resources, but it is the Board and not the Chairman or the Director of Human Resources that has final policymaking authority over personnel

decisions. *Ramos*, 1997 WL 4104493, at *4. Plaintiff has adduced no evidence that the

Board delegated policymaking authority to the Chairman (or the Director of Human

Resources), nor has she adduced evidence that her e-mail was distributed, or should have

been distributed, to other Board members for Board action.

Even assuming, *arguendo*, that the Chairman had final policymaking

authority, plaintiff's claim would still fail. While the e-mail begins by stating that "It is

very unfair and purely retaliation and discrimination", the allegedly discriminatory and

retaliatory conduct is nowhere described. (E-mail from Chin to Hernandez and Kutzbach

dated December 5, 2005, Ex. 8 to Nuwesra Aff.) In fact, the plaintiff never even uses the

word "race", instead spending most of the e-mail detailing the hardship imposed by her

transfer. (*Id.*) No reasonable factfinder could infer that the Chairman had notice of

discriminatory conduct that required obvious corrective action by the Board. Plaintiff's

case is far removed from the facts in *Amnesty America* where the defendant's

policymaker was a direct witness to abusive, unconstitutional conduct. *Amnesty Am.*, 361

F.3d at 127-28. And even if a reasonable factfinder could find notice of plainly

unconstitutional conduct here, plaintiff fails to adduce any evidence of *how* the Chairman

responded to the e-mail, much less that any response was deliberately indifferent. There

is simply no evidence that the Chairman acted with concern or confusion, let alone

deliberate indifference. Thus, plaintiff's claim fails for a failure of proof.[5] *See Dawson*

*v. County of Westchester*, 351 F. Supp. 2d 176, 195-96 (S.D.N.Y. 2004) (granting

---

[5] In the preliminary statement to her brief, plaintiff alleges that there is a discriminatory "pattern of practice" at the NYCHA. Pl. Br. at 1. The section of her brief devoted to *Monell* liability, however, does not argue in favor of municipal liability on a custom or practice theory, nor is NYCHA's allegedly discriminatory "pattern of practice" even mentioned. In any event, five transfers or promotion notices of white employees is not evidence of a discriminatory custom or practice, and plaintiff produces no other evidence to support such a theory.

summary judgment for municipal defendant in a discrimination suit when plaintiff failed to produce evidence of deliberate indifference); *Menes v. CUNY Univ. of N.Y.*, 92 F. Supp. 2d 294, 306-07 (S.D.N.Y. 2000) (same).

**IV.    Without Her Federal Claim, Plaintiff's State Law Claims Must Be Dismissed**

In the absence of a federal claim, the court declines to exercise supplemental jurisdiction over the remaining state law claims.  *See Seabrook v. Jacobson*, 153 F.3d 70, 72 (2d Cir. 1998) (noting that it is particularly appropriate for the district court to dismiss where "the federal claim on which the state claim hangs has been dismissed"); *see also Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir. 2001); *Moskovits v. New York City Housing Authority*, 99 Civ. 4114 (JSR), 2000 U.S. Dist. LEXIS 6692, at *9 (S.D.N.Y. May 17, 2000) (declining to exercise supplemental jurisdiction over related state claims after § 1983 claim dismissed on summary judgment).

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is granted. The Clerk of the Court is requested to close this case.

SO ORDERED.

Dated: New York, New York
  September 9, 2008

               Richard J. Holwell
            United States District Judge